IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| DAVENA E. JAMES, | ) | CASE NO.  1:24-CV-00003-BYP |
| | ) | |
| Plaintiff, | ) | |
| | ) | DISTRICT JUDGE |
| vs. | ) | BENITA Y. PEARSON |
| | ) | |
| COMMISSIONER OF SOCIAL | ) | MAGISTRATE JUDGE |
| SECURITY, | ) | JONATHAN D. GREENBERG |
| | ) | |
| Defendant. | ) | **REPORT & RECOMMENDATION** |
| | ) | |
| | ) | |

Plaintiff, Davena E. James ("Plaintiff" or "James"), challenges the final decision of Defendant, Martin O'Malley,[1] Commissioner of Social Security ("Commissioner"), denying her applications for a Period of Disability ("POD"), Disability Insurance Benefits ("DIB"), and Supplemental Security Income ("SSI") under Titles II and XVI of the Social Security Act, 42 U.S.C. §§ 416(i), 423, 1381 *et seq.* ("Act"). This Court has jurisdiction pursuant to 42 U.S.C. § 405(g). This case is before the undersigned United States Magistrate Judge pursuant to an automatic referral under Local Rule 72.2(b) for a Report and Recommendation. For the reasons set forth below, the Magistrate Judge recommends that the Commissioner's final decision be AFFIRMED.

## I.      PROCEDURAL HISTORY

On August 18, 2021, James filed an application for POD, DIB, and SSI, alleging a disability onset date of December 13, 2019, and claiming she was disabled due to abnormal uterine bleeding, pulmonary embolism, type II diabetes, acid reflux, pleuritic chest pain, chronic bilateral low back pain, primary

---

[1] On December 20, 2023, Martin O'Malley became the Commissioner of Social Security.

osteoarthritis of both knees, iron deficiency anemia, high blood pressure, and shortness of breath. (Transcript ("Tr.") 57.) The applications were denied initially and upon reconsideration, and James requested a hearing before an administrative law judge ("ALJ").  (*Id*. at 106-18.)

On October 31, 2022, an ALJ held a hearing, during which James, represented by counsel, and an impartial vocational expert ("VE") testified. (*Id*. at 35-54.) On January 3, 2023, the ALJ issued a written decision finding James was not disabled. (*Id*. at 14-30.) The ALJ's decision became final on November 13, 2023, when the Appeals Council declined further review. (*Id*. at 1-6.)

On January 2, 2024, James filed her Complaint to challenge the Commissioner's final decision. (Doc. No. 1.) The parties have completed briefing in this case. (Doc. Nos. 7, 9-10.) James asserts the following assignments of error:

(1)     The ALJ erred at Step Two of the Sequential Evaluation when he failed to properly apply the criteria of Social Security Ruling 96-8p and consider all of Plaintiff's impairments and related limitations when forming the RFC.

(2)     The ALJ erred when he failed to find that the findings of the Functional Capacity Evaluation were persuasive.

(3)     The ALJ erred when he failed to properly assess Plaintiff's obesity and its effect on her ability to engage in substantial gainful activity on a full-time and sustained basis.

(4)     At Steps Four and Five of the Sequential Evaluation, the ALJ's RFC finding that Plaintiff could perform her past relevant work or any other work in the national economy was not supported by substantial evidence.

(Doc. No. 7.)

## II.     EVIDENCE

### A.     Personal and Vocational Evidence

James was born in April 1984 and was 38 years-old at the time of her administrative hearing (Tr. 39), making her a "younger" person under Social Security regulations. *See* 20 C.F.R. §§ 404.1563(c),

2

416.963(c). She has a high-school education. (*Id*. at 39.) She has past relevant work as a salesclerk, housekeeping cleaner, and lending activity supervisor. (*Id*. at 48.)

**B.     Relevant Medical Evidence[2]**

   1.     **Relevant Physical Evidence**

James's weight fluctuated between 475 to 571 pounds throughout December 2019 to June 2021. (*Id*. at 302.) Before her alleged onset disability date, James saw Jillian Stephen, APRN-CNP, for an injection to manage her right knee pain. (*Id*. at 422.) She reported significant pain relief from a previous knee injection but continued to experience occasional "popping" in her right knee and worsening pain when walking or climbing stairs. (*Id*.) X-rays from 2017 and 2018 had shown moderate degenerative osteoarthritis in her left knee and marginal osteophytic spurring in the medical compartment of her right knee. (*Id*. at 423.)

Her physical examination revealed edema in her lower extremities and mild tenderness in the medial knee joint. (*Id*. at 422-25.) James was diagnosed with osteoarthritis of the right knee, morbid obesity, chronic right knee pain, and right-sided low back pain without sciatica. (*Id*. at 425.) James received a steroid injection in her right knee and Stephen discussed weight loss management with her. (*Id*.)

In March 2020, James returned with complaints of right knee pain and requested another injection. (*Id*. at 389.) She reported losing 50 pounds and a decrease in her lower back pain. (*Id*.) Stephen advised she could return for a knee injection after better diabetic management and weight loss. (*Id*. at 392.)

James also saw Alishea Gay, APRN-CNP, for management of her Type II diabetes. (*Id*. at 404-05.) She reported improved blood sugar levels with medication and no hypoglycemic episodes. (*Id*. at 384.) She denied diabetes-related symptoms but conceded she had not been checking her blood pressure regularly.

---

[2] The Court's recitation of the medical evidence is not intended to be exhaustive and is limited to the evidence cited in the parties' Briefs.

(*Id*. at 387.) Gay continued Metformin and Glipizide and encouraged James to test her blood sugar at least twice per day and limit foods high in glucose. (*Id*. at 388.)

In June 2021, James was hospitalized due to shortness of breath and chest pain. (*Id*. at 334.) She reported left side pain when breathing. (*Id*.) She was monitored for tachycardia and tachypnea. (*Id*. at 341.) Though a pulmonary embolism was suspected, her weight presented technical challenges with imaging, so she was started on precautionary Lovenox. (*Id*.) She remained cooperative and pleasant throughout her stay. (*Id*. at 349.) She was able to ambulate to the restroom and hospital room without difficulty but demonstrated some impairments with her endurance. (*Id*.) She exhibited a normal mood, behavior, and thought process. (*Id*. at 352-53.) After several days she was discharged with an anticoagulation medication for the suspected embolism. (*Id*. at 355-56.) During a follow-up visit one week later, she had high blood sugar but otherwise appeared unremarkable. (*Id*. at 319-23.) She reported feeling depressed and anxious and was given a psychiatric referral. (*Id*. at 322-23.)

In July 2021, during a diabetes management appointment, James showed no signs of lower extremity edema and her blood sugar ranged between 127-146mg/dL, occasionally reaching 192mg/dL. (*Id*. at 282-85.) She reported feeling "only a little" stress and noted regular contact with friends and family. (*Id*.) Her mood and demeanor were normal. (*Id*. at 286.)

In January 2022, at a follow-up evaluation, Benjamin S. King, Pharm.D, noted James's good adherence to her medication, diet, and exercise regimen. (*Id*. at 673.) He noted they discussed a diabetic diet in detail and the importance of consistent home glucose monitoring and medication compliance. (*Id.* at 674.)

That same month, James was referred to Neda Najimi, M.D. for a sleep consultation. (*Id.* at 675.) James reported consistent CPAP machine usage, but interrupted sleep patterns. (*Id*.) Dr. Najimi noted effective management of her severe obstructive sleep apnea with CPAP therapy compliance and nasal congestion medication. (*Id*. at 679.)

4

In July 2022, James saw Dr. Antwon Morton, D.O. (*Id.* at 814-20.) She reported knee and low back pain but could ambulate with a cane. (*Id.*) Dr. Morton found a moderately reduced range of motion in her back and edema in both knees. (*Id.* at 820.) He opined she could work at a sedentary level but thought it would be difficult given the extent of her disabilities and "nature of disease course." (*Id.*)

Dr. Morton completed a medical source statement in August 2022. Dr. Morton opined that James could sit for 30 minutes at a time, stand for five minutes at a time, sit for a total of four hours in an eight-hour workday, and stand or walk for less than two hours in an eight-hour workday. (*Id.* at 781.) He further opined she would need several unscheduled breaks per day and elevate her legs for 20% of the workday. (*Id.*) Dr. Morton expected James' absences to exceed four days per month. (*Id.* at 783.) He further opined that James required a cane for mobility. (*Id.* at 781-83.)  Dr. Morton attributed these limitations to James' bilateral knee osteoarthritis and morbid obesity. (*Id.* at 780-83.) He noted a July 2022 x-ray demonstrated the worst osteoarthritis was in the medical compartments of the knees, and a lumbar spine x-ray revealed mild multi-level degenerative changes. (*Id.* at 780.)

In September 2022, James returned to see Dr. Morton for her bilateral knee pain. (*Id.* at 901.) He provided her with a home exercise program and referred her for a steroid injection, which she received in October 2022. (*Id.* at 900-01.)

2.      **Relevant Psychological Evidence**

In November 2021, James saw James Tanley, Ph.D., for a consultative psychological evaluation. (*Id.* at 652.) She reported feeling depressed but was cooperative and exhibited normal thought processes. (*Id.* at 654.) She reported anhedonia with mood problems and depression "due to life circumstances," but did not cry during the examination, nor did she exhibit any suicidal/homicidal ideations or feelings of hopelessness, helplessness, or worthlessness. (*Id.*) Her recent and remote memory were "essentially intact," and she demonstrated no evidence of apprehension, fear, or sense of impending doom. (*Id.*) She reported

Citalopram helped, but she remained symptomatic. (*Id*. at 655.) Dr. Tanley opined she would be expected to show little to no difficulty with tasks of increasing complexity and multistep tasks. (*Id*. at 656.) However, he maintained her mood problems and/or anhedonia could present difficulties with her ability to focus and interact socially. (*Id*. at 656.) While she did not report problems with others at work, he believed her current mood and/or anhedonia would lower her frustration tolerance. (*Id*.)

In February 2022, James met with Parvathi Nanjundiah, M.D., where James reported intermittent periods of depression, overeating/emotional eating, crying spells, sleep disturbance, fatigue, and low energy. (*Id*. at 744.) She also reported auditory and visual hallucinations of giants at night, as well as frequent anxiousness, excessive worrying, restlessness, difficulty concentrating, and irritability. (*Id*. at 744-45.)  Dr. Nanjundiah noted she was cooperative, had a logical and normal thought process, and demonstrated sustained attention, concentration, and memory. (*Id*. at 756.) Despite her depression, anxiety, and dysphoric mood, she maintained good judgment and sustained attention, and her recent and remote memory were "within normal limits." (*Id*.)

James began regular counseling sessions with Elevani Fletcher, LPCC-S, in February 2022. (*Id.* at 769-71.) She was cooperative and exhibited unremarkable memory, judgment, and attention. (*Id*. at 770.) She reported compliance with her psychotropic medications, but claimed she was isolating more and suffered a loss of energy. (*Id*.) Although she demonstrated a dysphoric mood and constrained affect, she reported a decrease in crying spells. (*Id*.) she indicated she "think[s] [she] is ok." (*Id.* at 791.) She appeared adequately groomed, cooperative, and maintained a logical and organized thought process. (*Id*.) While she displayed a dysphoric mood, she reported fewer crying spells. (*Id*.) Her attention and concentration were sustained, and she demonstrated recent and remote memory within normal limits. (*Id*.) She continued therapy in June, July, and August 2022, where she reported ongoing feelings of depression. (*Id*. at 867-75.) Fletcher found James as "stabilizing" or had a stable mood. (*Id*.)

6

In a July 2022 counseling session, she was reported as cooperative, adequately groomed, and demonstrating a logical and organized thought process. (*Id.* at 870.) Her attention span and concentration were sustained, and her memory functioned within normal parameters. (*Id.*)

**C.    State Agency Reports**

1.    **Mental Impairments**

In December 2021, state agency psychological consultant Cynthia Waggoner, Psy.D., reviewed the record and opined that James had "mild" limitations in her ability to understand, remember, or apply information, interact with others, concentrate, persist, or maintain pace, and adapt or manage herself. (*Id.* at 60, 68.) Dr. Waggoner noted that James alleged physical limitations only, although medical records suggested the presence of treated depression without evidence of severe conditions. (*Id.*)

On March 18, 2022, on reconsideration, Paul Tangeman, Ph.D., affirmed Dr. Waggoner's findings. (*Id.* at 77-78.)

2.    **Physical Impairments**

In September 2021, Dr. Sai Nimmagadda, M.D., reviewed the record and opined that James could occasionally lift and/or carry upwards of 20 pounds and frequently lift and/or carry upwards of 10 pounds. (*Id.* at 61.) She could sit and/or walk for a total of two hours in an eight-hour workday and sit for a total of six hours in an eight-hour workday. (*Id.*) She could occasionally climb ramps and/or stairs, but never climb ladders, ropes, or scaffolds. (*Id.* at 62.) She could occasionally kneel, crouch, and crawl. (*Id.*) She could frequently balance and stoop. (*Id.*) She must avoid even moderate exposure to extreme cold, extreme hot, wetness, humidity, fumes, odors, dusts, gasses, and poor ventilation. (*Id.*) She must avoid all exposure to hazards. (*Id.*) Dr. Nimmagadda attributed these restrictions to her obesity, knee degenerative joint disease, and shortness of breath. (*Id.*)

On March 23, 2022, on reconsideration, Diane Manos, M.D., affirmed Dr. Nimmagadda's findings. (*Id*. at 81.)

## D. Hearing Testimony

During the October 31, 2022 hearing, James testified to the following:

- She left her prior job when the company went out of state, and she would still be working there if they had not left. (*Id*. at 41.) They let her sit more and take her time, and they obtained a special chair equipped for her size and weight to help her. (*Id*. at 44.) She can drive, but it bothers her knees after a while. (*Id*. at 47.)

- She sees a counselor regularly. (*Id*. at 41.) She said they are working through her anxiety, depression, and past childhood abuse. (*Id*. ) She said she feels better after counseling sessions. (*Id*.) She reported her psychiatric medications work "quite a bit." (*Id*. at 42-43.) If she was still working at her prior job, her psychological problems would not affect her. (*Id*. at 43.)

- She reported knee injections help alleviate pain. (*Id*. at 45.) She feels tired and sore after walking for about a minute and a half and needs to rest. (*Id*.) She may take one or more naps per day. (*Id*. at 46.) She reported problems with her breathing and noted she is on two inhalers. (*Id*. at 47.) She said her diabetes makes her dizzy. (*Id*.)

The VE testified James had past work as a salesclerk, housekeeping cleaner, lending activity supervisor, and food salesclerk. (*Id*. at 48.) The ALJ then posed the following hypothetical question:

> This person is of the same age, education and work background as Ms. James. This person can lift, carry 20 pounds occasionally, 10 pounds frequently, can stand, walk two out of eight, can sit eight out of eight, push, pull, and foot pedal are both constant bilaterally. This person can occasionally use a ramp or a stair, but never a ladder, a rope, or a scaffold, can frequently stoop, occasionally knee, occasionally crouch, and occasionally crawl. There are no manipulative, visual, or communications limitations. This person must avoid high concentrations of extreme cold, extreme heat, wetness, humidity, and smoke, fumes, pollutants and dust – must avoid all those in high concentrations. This person must avoid entirely dangerous machinery and unprotected heights. There are no severe mental limitations, and that's it.

(*Id*. at 49-50.)

The VE testified the hypothetical individual could perform past work as a lending activities supervisor. (*Id*.) The VE further testified the hypothetical individual could also perform other representative jobs in the economy, such as a call out operator, addresser, and document preparer. (*Id*.)

James's attorney questioned the VE about accommodations needed for a hypothetical individual who required a special chair provided by their employer for sedentary work. (*Id*. at 51.) The VE opined that while such an accommodation would be provided in skilled work, it would be considered an accommodation in unskilled work. (*Id*.) The attorney then inquired how the ability to perform sedentary jobs would be affected if the hypothetical individual needed to elevate their legs due to pain and/or swelling. (*Id*.) The VE testified this would prevent them from performing unskilled sedentary work. (*Id*.) The VE further testified that being off-task for 10 minutes per hour or having limited standing and walking capabilities (less than two hours combined in an eight-hour workday) while being able to sit for only four hours total would preclude the hypothetical individual from performing any work. (*Id*. at 53.)

## II. STANDARD FOR DISABILITY

In order to establish entitlement to DIB under the Act, a claimant must be insured at the time of disability and must prove an inability to engage "in substantial gainful activity by reason of any medically determinable physical or mental impairment," or combination of impairments, that can be expected to "result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 20 C.F.R. §§ 404.130, 404.315, 404.1505(a).

A claimant is entitled to a POD only if the claimant: (1) had a disability; (2) was insured when the claimant became disabled; and (3) filed while the claimant was disabled or within twelve months of the date the disability ended. 42 U.S.C. § 416(i)(2); 20 C.F.R. § 404.320.

9

A disabled claimant may also be entitled to receive SSI benefits. 20 C.F.R. § 416.905; *Kirk v. Sec'y of Health & Human Servs.*, 667 F.2d 52[4] (6th Cir. 1981). To receive SSI benefits, a claimant must meet certain income and resource limitations.  20 C.F.R. §§ 416.1100, 416.1201.

The Commissioner reaches a determination as to whether a claimant is disabled by way of a five-stage process. 20 C.F.R. §§ 404.1520(a)(4)*,* 416.920(a)(4). *See also Ealy v. Comm'r of Soc. Sec.*, 594 F.3d 504, 51[2] (6th Cir. 2010); *Abbott v. Sullivan*, 905 F.2d 918, 92 (6th Cir. 1990). First, the claimant must demonstrate that they are not currently engaged in "substantial gainful activity" at the time of the disability application. 20 C.F.R. §§ 404.1520(b), 416.920(b). Second, the claimant must show that they suffer from a "severe impairment" in order to warrant a finding of disability. 20 C.F.R. §§ 404.1520(c), 416.920(c). A "severe impairment" is one that "significantly limits . . . physical or mental ability to do basic work activities." *Abbot*, 905 F.2d at 923. Third, if the claimant is not performing substantial gainful activity, has a severe impairment that is expected to last for at least twelve months, and the impairment, or combination of impairments, meets or medically equals a required listing under 20 CFR Part 404, Subpart P, Appendix 1, the claimant is presumed to be disabled regardless of age, education, or work experience. *See* 20 C.F.R. §§ 404.1520(d), 416.920(d). Fourth, if the claimant's impairment or combination of impairments does not prevent the claimant from doing their past relevant work, the claimant is not disabled. 20 C.F.R. §§ 404.1520(e)-(f), 416.920(e)-(f). For the fifth and final step, even if the claimant's impairment does prevent the claimant from doing their past relevant work, if other work exists in the national economy that the claimant can perform, the claimant is not disabled. 20 C.F.R. §§ 404.1520(g), 404.1560(c), 416.920(g).

Here, James was insured on the alleged disability onset date, December 13, 2019, and remains insured through December 31, 2024, the date last insured ("DLI"). (Tr. 19.) Therefore, to be entitled to POD and DIB, James must establish a continuous twelve-month period of disability commencing between these

dates. Any discontinuity in the twelve-month period precludes an entitlement to benefits.  *See Mullis v. Bowen*, 861 F.2d 991, 994 (6th Cir. 1988); *Henry v. Gardner*, 381 F.2d 191, 195 (6th Cir. 1967).

## IV.  SUMMARY OF COMMISSIONER'S DECISION

The ALJ made the following findings of fact and conclusions of law:

1.  The claimant meets the insured status requirements of the Social Security Act through December 31, 2024.

2.  The claimant has not engaged in substantial gainful activity since December 13, 2019, the alleged onset date (20 CFR 404.1571 *et seq*., and 416.971 *et seq*.).

3.  The claimant has the following severe impairments: morbid obesity; pulmonary embolism; seborrheic dermatitis; diabetes mellitus; essential hypertension; bilateral knee osteoarthritis (20 CFR 404.1520(c) and 416.920(c)).

4.  The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925 and 416.926).

5.  After careful consideration of the entire record, I find that the claimant has the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) and 416.967(b) except can lift 20 pounds occasionally, 10 pounds frequently. can stand/walk 2 hours out of an 8-hour workday. Can sit 8 hours. Can constantly push, pull, and use foot pedals. Can occasionally climb ramps and stairs. Can never climb ladders, ropes, or scaffolds. Can frequently stoop. Can occasionally kneel, crouch, and crawl. No high concentration exposure to extreme cold, extreme heat, wetness, humidity, smokes, fumes, pollutants, and dust.

6.  The claimant is capable of performing past relevant work as a lending activities supervisor. This work does not require the performance of work-related activities precluded by the claimant's residual functional capacity (20 CFR 404.1565 and 416.965).

7.  The claimant has not been under a disability, as defined in the Social Security Act, from December 13, 2019, through the date of this decision (20 CFR 404.1520(f) and 416.920(f)).

(Tr. 19-29.)

## V. STANDARD OF REVIEW

The Social Security Act authorizes narrow judicial review of the final decision of the Social Security Administration (SSA)." *Reynolds v. Comm'r of Soc. Sec.*, 424 F. App'x 411, 414 (6th Cir. 2011). Specifically, this Court's review is limited to determining whether the Commissioner's decision is supported by substantial evidence and was made pursuant to proper legal standards. *See Ealy v. Comm'r of Soc. Sec.*, 594 F.3d 504, 512 (6th Cir. 2010); *White v. Comm'r of Soc. Sec.*, 572 F.3d 272, 281 (6th Cir. 2009). Substantial evidence has been defined as "'more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007) (quoting *Cutlip v. Sec'y of Health and Human Servs.*, 25 F.3d 284, 286 (6th Cir. 1994)). In determining whether an ALJ's findings are supported by substantial evidence, the Court does not review the evidence *de novo*, make credibility determinations, or weigh the evidence. *Brainard v. Sec'y of Health & Human Servs.*, 889 F.2d 679, 681 (6th Cir. 1989).

Review of the Commissioner's decision must be based on the record as a whole. *Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 535 (6th Cir. 2001). The findings of the Commissioner are not subject to reversal, however, merely because there exists in the record substantial evidence to support a different conclusion. *Buxton v. Halter*, 246 F.3d 762, 772-73 (6th Cir. 2001) (citing *Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986)); *see also Her v. Comm'r of Soc. Sec.*, 203 F.3d 388, 389-90 (6th Cir. 1999) ("Even if the evidence could also support another conclusion, the decision of the Administrative Law Judge must stand if the evidence could reasonably support the conclusion reached."). This is so because there is a "zone of choice" within which the Commissioner can act, without the fear of court interference. *Mullen*, 800 F.2d at 545 (citing *Baker v. Heckler*, 730 F.2d 1147, 1150 (8th Cir. 1984)).

In addition to considering whether the Commissioner's decision was supported by substantial evidence, the Court must determine whether proper legal standards were applied. Failure of the

Commissioner to apply the correct legal standards as promulgated by the regulations is grounds for reversal. *See, e.g., White v. Comm'r of Soc. Sec.*, 572 F.3d 272, 281 (6th Cir. 2009); *Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 746 (6th Cir. 2006) ("Even if supported by substantial evidence, however, a decision of the Commissioner will not be upheld where the SSA fails to follow its own regulations and where that error prejudices a claimant on the merits or deprives the claimant of a substantial right.")

Finally, a district court cannot uphold an ALJ's decision, even if there "is enough evidence in the record to support the decision, [where] the reasons given by the trier of fact do not build an accurate and logical bridge between the evidence and the result." *Fleischer v. Astrue*, 774 F. Supp. 2d 875, 877 (N.D. Ohio 2011) (quoting *Sarchet v. Chater,* 78 F.3d 305, 307 (7th Cir. 1996)); *accord Shrader v. Astrue*, No. 11-1300, 2012 WL 5383120, at *6 (E.D. Mich. Nov. 1, 2012) ("If relevant evidence is not mentioned, the Court cannot determine if it was discounted or merely overlooked."); *McHugh v. Astrue*, No. 1:10-cv-734, 2011 WL 6130824 (S.D. Ohio Nov. 15, 2011); *Gilliam v. Astrue*, No. 2:10-CV-017, 2010 WL 2837260 (E.D. Tenn. July 19, 2010); *Hook v. Astrue*, No. 1:09-cv-1982, 2010 WL 2929562 (N.D. Ohio July 9, 2010).

## VI.  ANALYSIS

### A.  Step Two Challenge

In her first assignment of error, James asserts the ALJ erred at Step Two of the Sequential Evaluation by failing to properly apply the criteria of Social Security Ruling 96-8p and consider all impairments and related limitations when forming the RFC. (Doc. No. 7 at 8.) She argues the ALJ neglected to acknowledge her "severe psychological impairment," which would preclude her from performing past relevant work. (*Id.* at 9.) In addition, she maintains the ALJ based his findings on her ability to provide information about her health and maintain daily living activities. (*Id*. at 10.)

The Commissioner responds that the ALJ recognized James's severe physical impairments but found her mental impairments non-severe. (Doc. No. 9 at 9.) He asserts the ALJ considered James's medically

13

determinable mental impairments of major depressive disorder and PTSD, concluding that both individually and collectively, they imposed minimal limitations on her basic mental work activities. (*Id.*) The Commissioner cites instances where the ALJ noted James exhibited positive interactions with providers and staff, displayed a normal mood and demeanor, and had "no problems with temper control." (*Id.*) Furthermore, the Commissioner maintains that substantial evidence in the record supports the ALJ's decision, and therefore remand is not warranted. (*Id.* at 10-11).

In her Reply, James contends her symptoms affect her memory and render her unable to perform any skilled or semi-skilled jobs. (Doc. No. 10 at 1.) She cites to her testimony about needing reminders and attending counseling due to anxiety and depression, as well as the records that noted her to have a "depressed, anxious and dysphoric mood with a constricted affect." (*Id.*) She further argues the ALJ failed to address the consistency of Dr. Morton's medical opinion with the remainder of the medical evidence. (*Id.* at 2-3.)

The Act defines a disability as "an inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). A medically determinable impairment is one that results from anatomical, physiological, or psychological abnormalities which can be shown by medically acceptable clinical and laboratory techniques. *See* 20 CFR §§ 404.1521, 416.921; Social Security Ruling ("SSR") 96–4p, 1996 WL 374187, at *1 (July 2, 1996). A physical or mental impairment must be established by medical evidence consisting of signs, symptoms, and laboratory findings. *Id.*

Further, "under no circumstances may the existence of an impairment be established on the basis of symptoms alone." *Id.* Thus, "regardless of how many symptoms an individual alleges, or how genuine the individual's complaints may appear to be, the existence of a medically determinable physical or mental

14

impairment cannot be established in the absence of objective medical abnormalities; i.e., medical signs and laboratory findings." SSR 96-4p (footnote omitted). *See also* 20 C.F.R. §§ 404.1529(b), 416.929(b) ("Your symptoms . . . will not be found to affect your ability to do basic work activities unless medical signs or laboratory findings show that a medically determinable impairment(s) is present."). *See also Torrez v. Comm'r of Soc. Sec.*, No. 3:16CV00918, 2017 WL 749185, at *6 (N.D. Ohio Feb. 6, 2017), *report and recommendation adopted by* 2017 WL 735157 (N.D. Ohio Feb. 24, 2017); *Crumrine-Husseini v. Comm'r of Soc. Sec.*, 2:15-cv-3103, 2017 WL 655402, at *8 (S.D. Ohio Feb. 17, 2017), *report and recommendation adopted by* 2017 WL 1187919 (N.D. Ohio March 30, 2017). The claimant bears the burden of establishing the existence of a medically determinable impairment. *See* 42 U.S.C. § 423(d)(5)(A) ("An individual shall not be considered to be under a disability unless he furnishes such medical and other evidence thereof as the Secretary may require."). *See also Kavalousky v. Colvin*, No. 5:12-CV-2162, 2013 WL 1910433, at *7 (N.D. Ohio April 19, 2013), *report and recommendation adopted by* 2013 WL 1910843 (N.D. Ohio May 8, 2013).

Once an ALJ has determined a claimant has a medically determinable impairment, the ALJ must then determine whether that impairment is "severe" for purposes of Social Security regulations. *See* 20 C.F.R. §§ 404.1520(a)(4)(ii), 416.920(a)(4)(ii). As noted *supra*, the regulations define a "severe" impairment as an "impairment or combination of impairments which significantly limits [the claimant's] physical or mental ability to do basic work activities . . ." 20 CFR §§ 404.1520(c), 416.920(c). "Basic work activities" are defined as "the abilities and aptitudes necessary to do most jobs." 20 C.F.R. §§ 404.1522(b), 416.922(b). Examples include: (1) physical functions such as walking, standing, sitting, lifting, pushing, pulling, reaching, carrying, or handling; (2) capacities for seeing, hearing, and speaking; (3) understanding, carrying out, and remembering simple instructions; (4) use of judgment; (5) responding appropriately to

supervision, co-workers, and usual work situations; and (6) dealing with changes in a routine work setting. *Id*.

The Sixth Circuit construes the Step Two severity regulation as a "*de minimis* hurdle," *Rogers*, 486 F.3d at 243 n.2, intended to "screen out totally groundless claims." *Farris v. Sec'y of Health & Human Servs*., 773 F.2d 85, 89 (6th Cir.1985).  *See also Anthony v. Astrue*, 266 F. App'x 451, 457 (6th Cir.  2008). Thus, if an impairment has "more than a minimal effect" on the claimant's ability to do basic work activities, the ALJ must treat it as "severe." SSR 96–3p, 1996 WL 374181, at *1 (July 2, 1996). However, if an ALJ makes a finding of severity as to just one impairment, the ALJ then "must consider limitations and restrictions imposed by all of an individual's impairments, even those that are not 'severe.'" SSR 96–8p, 1996 WL 374184 at *5 (July 2, 1996). This is because "[w]hile a 'not severe' impairment(s) standing alone may not significantly limit an individual's ability to do basic work activities, it may--when considered with limitations or restrictions due to other impairments--be critical to the outcome of a claim." *Id*. "For example, in combination with limitations imposed by an individual's other impairments, the limitations due to such a 'not severe' impairment may prevent an individual from performing past relevant work or may narrow the range of other work that the individual may still be able to do."  *Id*.

When the ALJ considers all of a claimant's impairments in the remaining steps of the disability determination, the failure to find additional severe impairments at Step Two does "not constitute reversible error." *Maziarz v. Sec'y of Health & Human Servs*., 837 F.2d 240, 244 (6th Cir. 1987); *see also Nejat v. Comm'r of Soc. Sec*., 359 F. App'x 574, 577 (6th Cir. 2009). The Sixth Circuit has observed that where a claimant clears the hurdle at Step Two (*i.e.*, an ALJ finds that a claimant has established at least one severe impairment) and a claimant's severe and non-severe impairments are considered at the remaining steps of the sequential analysis, "[t]he fact that some of [claimant's] impairments were not deemed to be severe at step two is ... legally irrelevant." *Anthony*, 266 F. App'x at 457.

16

At Step Two, the ALJ identified the severe impairments of morbid obesity, pulmonary embolism, seborrheic dermatitis, diabetes mellitus, essential hypertension, and bilateral knee osteoarthritis. (Tr. at 19.) The ALJ concluded James did not have a "severe mental impairment," noting that her medically determinable mental impairments of major depressive disorder and PTSD, considered singly and in combination, did not impose more than a "minimal limitation" on her ability to perform basic mental work activities, and therefore were not severe. (*Id*. at 20.) The ALJ then considered all four broad functional areas set forth in the "paragraph B" criteria and determined James had mild limitations in the areas of activities of understanding, remembering, or applying information, interacting with others, concentration, ability to maintain pace, and persistence, and adaptation. (*Id*.) The ALJ found that "[b]ecause the claimant's medically determinable mental impairments caused no more than 'mild' limitation in any of the functional areas <u>and</u> the evidence does not otherwise indicate that there is more than a minimal limitation in the claimant's ability to do basic work activities, they are non-severe. (20 CFR 404.1520a(d)(1) and 416.920a(d)(1))." (*Id.*) (emphasis in original).

The ALJ also gave great weight to the opinions of the state agency psychological consultants, who opined that James's mental impairments were non-severe and caused mild limitations in the areas of activities of daily living, social functioning, and maintaining concentration, persistence, or pace, with no episodes of decompensation.  (*Id.* at 59-60, 77-78). James fails to challenge the weight assigned to the state agency reviewing psychologists on judicial review (Doc. No. 7.)

The ALJ provided a thorough and detailed analysis to support the determination that James' mental impairments were non-severe.  The ALJ expressly considered James's mental impairments in the RFC analysis.  (*Id.* at 22-28.)  As the ALJ considered James's impairments, severe and non-severe, in the RFC analysis, there is no reversible error.

**B.      Dr. Morton's Functional Capacity Evaluation**

In her second assignment of error, James contends the ALJ erred by not finding Dr. Morton's functional capacity evaluation persuasive. (Doc. No. 7 at 11.)  James implies that the ALJ's findings regarding Dr. Morton's opinions were ambiguous, as the ALJ found the opinions unpersuasive because they contained excessive limitations but then noted that a less than sedentary level was consistent with the record. (*Id.* at 13.) James argues it is unclear whether the ALJ determined that the opinions were supported by and consistent with the record or not.  (*Id.*)  However, James maintains that Dr. Morton's opinions were supported by and consistent with the medical evidence in this matter.  (*Id.* at 14.)

The Commissioner responds that, when read as a whole, the ALJ's decision is not ambiguous. (Doc. No. 9 at 13.)  The Commissioner argues that the ALJ found James capable of lifting 20 pounds occasionally and 10 pounds frequently (consistent with light work) but limited her to only two hours of standing/walking in an eight-hour workday (consistent with sedentary work). (*Id.*) The Commissioner maintains the ALJ therefore agreed with Dr. Morton that the record supported a range of sedentary work regarding standing and walking, but he disagreed that the record supported additional restrictions that would result in a disability finding. (*Id.*)  The Commissioner asserts that the ALJ "properly evaluated" Dr. Morton's opinions for supportability and consistency. (*Id.*)

Since James's claim was filed after March 27, 2017, the Social Security Administration's new regulations ("Revised Regulations") for evaluation of medical opinion evidence apply to this claim. *See Revisions to Rules Regarding the Evaluation of Medical Evidence (Revisions to Rules)*, 2017 WL 168819, 82 Fed. Reg. 5844 (Jan. 18, 2017); 20 C.F.R. §§ 404.1520c, 416.920c.

Under the Revised Regulations, the Commissioner will not "defer or give any specific evidentiary weight, including controlling weight, to any medical opinion(s) or prior administrative medical findings, including those from your medical sources." 20 C.F.R. §§ 404.1520c(a), 416.920c(a). Rather, the

Commissioner shall "evaluate the persuasiveness" of all medical opinions and prior administrative medical findings using the factors set forth in the regulations: (1) supportability;[3] (2) consistency;[4] (3) relationship with the claimant, including length of the treatment relationship, frequency of examinations, purpose of the treatment relationship, extent of the treatment relationship, and examining relationship; (4) specialization; and (5) other factors, including but not limited to evidence showing a medical source has familiarity with the other evidence in the claim or an understanding of the agency's disability program's policies and evidentiary requirements. 20 C.F.R. §§ 404.1520c(a), (c)(1)-(5), 416.920c(a), (c)(1)-(5). However, supportability and consistency are the most important factors. 20 C.F.R. §§ 404.1520c(b)(2), 416.920c(b)(2).

The Revised Regulations also changed the articulation required by ALJs in their consideration of medical opinions. The new articulation requirements are as follows:

> (1) Source-level articulation. Because many claims have voluminous case records containing many types of evidence from different sources, it is not administratively feasible for us to articulate in each determination or decision how we considered all of the factors for all of the medical opinions and prior administrative medical findings in your case record. Instead, when a medical source provides multiple medical opinion(s) or prior administrative medical finding(s), we will articulate how we considered the medical opinions or prior administrative medical findings from that medical source together in a single analysis using the factors listed in paragraphs (c)(1) through (c)(5) of this section, as appropriate. We are not required to articulate how we considered each medical opinion or prior administrative medical finding from one medical source individually.

> (2) Most important factors. The factors of supportability (paragraph (c)(1) of this section) and consistency (paragraph (c)(2) of this section) are the most important factors we consider when we determine how persuasive we

---

[3] The Revised Regulations explain the "supportability" factor as follows: "The more relevant the objective medical evidence and supporting explanations presented by a medical source are to support his or her medical opinion(s) or prior administrative medical finding(s), the more persuasive the medical opinions or prior administrative medical finding(s) will be." 20 C.F.R. §§ 404.1520c(c)(1), 416.920c(c)(1).

[4] The Revised Regulations explain the "consistency" factor as follows: "The more consistent a medical opinion(s) or prior administrative medical finding(s) is with the evidence from other medical sources and nonmedical sources in the claim, the more persuasive the medical opinion(s) or prior administrative medical finding(s) will be." 20 C.F.R. §§ 404.1520c(c)(2), 416.920c(c)(2).

find a medical source's medical opinions or prior administrative medical findings to be. Therefore, we will explain how we considered the supportability and consistency factors for a medical source's medical opinions or prior administrative medical findings in your determination or decision. We may, but are not required to, explain how we considered the factors in paragraphs (c)(3) through (c)(5) of this section, as appropriate, when we articulate how we consider medical opinions and prior administrative medical findings in your case record.

(3) Equally persuasive medical opinions or prior administrative medical findings about the same issue. When we find that two or more medical opinions or prior administrative medical findings about the same issue are both equally well-supported (paragraph (c)(1) of this section) and consistent with the record (paragraph (c)(2) of this section) but are not exactly the same, we will articulate how we considered the other most persuasive factors in paragraphs (c)(3) through (c)(5) of this section for those medical opinions or prior administrative medical findings in your determination or decision.

20 C.F.R. §§ 404.1520c(b)(1)-(3), 416.920c(b)(1)-(3).

"Although the regulations eliminate the 'physician hierarchy,' deference to specific medical opinions, and assigning 'weight' to a medical opinion, the ALJ must still 'articulate how [he/she] considered the medical opinions' and 'how persuasive [he/she] find[s] all of the medical opinions.'" *Ryan L.F. v. Comm'r of Soc. Sec.,* No. 6:18-cv-01958-BR, 2019 WL 6468560, at *4 (D. Ore. Dec. 2, 2019) (quoting 20 C.F.R. § 416.920c(a), (b)(1)). A reviewing court "evaluates whether the ALJ properly considered the factors as set forth in the regulations to determine the persuasiveness of a medical opinion." *Id.*

The ALJ analyzed Dr. Morton's opinions as follows:

Dr. Antwon L. Morton completed a physical medical source statement on August 22, 2022, and afunctional capacity assessment on July 11, 2022. Both of these statements are unpersuasive. The physical assessment form noted that the claimant can sit about 4 hours a day and stand/walk less than 2 hours. he noted the claimant needs to elevate her legs to 90 degrees, 20% of the day. He noted that the claimant would be off task 25% or more of the workday and would miss more than four days per month. (See 6F). The Functional Capacity Evaluation completed by Dr. Morton Antwon, is also unpersuasive. He opined, "The patient could work at a sedentary level. However, given the extent of their disabilities and nature of the disease course, even sedentary work would prove difficult. This patient should seriously be considered a candidate for disability." (8F:30-36). Both of

these forms contain excessive limitations that are unsupported by the record and are conclusory in nature. While a less than sedentary level is consistent with the record, Dr. Morton notes the claimant would have excessive absenteeism, but does not adequately support these findings. In the same form, Dr. Morton the claimant is capable of low stress work, so it appears internally inconsistent that the claimant would also be off task more than 25% of the day. Lastly, the functional assessment was created on the initial encounter date and is conclusory in nature.

(Tr. at 27.)

In weighing the state agency reviewing physicians' opinions, the ALJ found as follows:

The State Agency consultants are found to be persuasive. they opined that the claimant would have non-severe mental impairments with no more than mild impairments in the mental functional areas. **They opined that the claimant would be capable of a less than light level, but with standing/walking 2 hours a day. they added postural limitations to account for the claimant's obesity, knee degeneration, and shortness of breath. They added environmental limitations to account for the claimant's respiratory issues. (See 3A, 4A, 7A, and 8A). This is consistent with the record.** Mentally, despite the claimant's subjective allegations of memory issues and needing reminders, mental status exams were generally normal. Physically, despite her morbid obesity and knee degeneration, range of motion was within functional limits in extension and flexion. No crepitance was noted. No ligamentous laxity with anterior/ posterior drawer, or with varus/valgus stress. **Although the notes regarding the claimant's antalgic gait support the sedentary exertional level (due to standing/walking limitations), a more limited RFC is not supported.** For these reasons, the State Agency consultants are found to be persuasive.

(*Id.* at 26) (emphasis added).  The Court notes that James does not challenge the weight assigned to the state agency reviewing physicians' opinions on judicial review.  (Doc. No. 7.)

Elsewhere in the RFC analysis, the ALJ found as follows:

**A light level exertion is supported by the record that did not show upper extremity deficits. Based on the claimant's noted antalgic gait and obesity, limiting the claimant to standing/walking 2 hours is supported. More limited RFC is not supported by the record.** the record does not indicate that the claimant needs an assistive device to ambulate. The record does not contain a notation that an ambulatory device is required. Exams noted the claimant either had a normal gait, or an antalgic gait. However, the claimant did not show a need for an ambulatory device at any examination. A more limited physical RFC is not supported.

21

(Doc. No. 27) (emphasis added).

Supportability and consistency are the most important factors under the new regulations for evaluating medical source opinions. 20 C.F.R. §§ 404.1520c(a), 416.920c(a). The ALJ considered the supportability and consistency of Dr. Morton's opinions. (*Id.* at 27.) The ALJ found Dr. Morton's conclusion regarding excessive absenteeism lacked adequate support. (*Id.*) In addition, the ALJ found Dr. Morton's opinion internally inconsistent, as he found James was capable of low stress work but also opined James would be off task for more than 25% of the workday. (*Id.* at 27.) The ALJ determined the functional assessment was conclusory in nature. (*Id.* at 27.) Moreover, as the ALJ found, Dr. Morton completed the functional assessment the same day he first saw James. (*Id.* at 814, 820.) Dr. Morton completed a check-the-box Physical Medical Source Statement in August 2022 and noted he had only seen James once. (*Id.* at 780-83.) Elsewhere in the RFC analysis, the ALJ discussed evidence that was unsupportive of disability. (*Id.* at 22-27.) It is the ALJ's job to weigh the evidence and resolve conflicts, and he did so here. While James would weigh the evidence differently, it is not for the Court to do so on appeal.

As this Court has previously stated, "reciting medical evidence does not show that the ALJ's decision is not supported by substantial evidence. *See Jones*, 336 F.3d at 477 (even if substantial evidence supports a claimant's position, a court can't overturn the Commissioner's decision if substantial evidence supports the ALJ's conclusion)." *Garcia v. Comm'r of Soc. Sec.*, Case No. 1:22-cv-1044, 2023 WL 2333520, at *7 (N.D. Ohio Jan. 27, 2023), *report and recommendation adopted by* 2023 WL 2330893 (N.D. Ohio Mar. 2, 2023).

While the paragraph regarding Dr. Morton's opinions is not a model of clarity, in reading the ALJ's decision as a whole, as the Court must do, the Court can follow the ALJ's reasoning. A perfect opinion is not required. *Fisher v. Bowen*, 869 F.2d 1055, 1057 (7th Cir. 1989) ("No principle of administrative law or common sense requires us to remand a case in quest of a perfect opinion unless there is reason to believe

that the remand might lead to a different result.") (citations omitted); *see also NLRB v. Wyman-Gordon Co.*, 394 U.S. 759, 766 n.6, 89 S.Ct. 1426, 22 L.Ed.2d 709 (1969) (when "remand would be an idle and useless formality," courts are not required to "convert judicial review of agency action into a ping-pong game.").

There is no error.

### C.     The ALJ appropriately considered the effect of obesity on James's ability to engage in substantial gainful activity.

In her third assignment of error, James asserts the ALJ erred in his assessment of her obesity and its impact on her ability to sustain gainful activity on a full-time basis. (Doc. No. 7 at 15.) She argues that while the ALJ limited her standing and walking to no more than two hours in an eight-hour workday, he overlooked how her obesity affects her other severe impairments. (*Id*. at 16.) James asserts that, during the relevant time period, her weight ranged from 475 to 571 pounds.  (*Id.*) She contends the ALJ neglected to consider recommendations for weight loss as a treatment for her impairments. (*Id.*) She further challenges the ALJ's position that she can engage in substantial gainful activity consistently. (*Id*.) Specifically, James points to the VE's testimony that the need for a special chair would be provided in skilled work, but otherwise would require an accommodation in unskilled sedentary work. (*Id.* at 17.) James argues the ALJ's failure to include the limitation for a special chair was harmful error.[5] (*Id.*)

In response, the Commissioner argues that the ALJ discussed treatment records documenting James's weight alongside observations of her normal range of motion and generally normal gait. (Doc. No. 9 at 14.) He also asserts that the ALJ found the state agency medical opinions to be persuasive, which included consideration of her obesity and physical impairments, based on their review of the treatment records and prior administrative findings. (*Id*. at 16.)

---

[5] These three sentences comprise the entirety of James's argument.  Therefore, the Court finds this argument is waived for lack of development.  *Kuhn v. Washtenaw Cnty.*, 709 F.3d 612, 624 (6th Cir. 2013) ("This court has consistently held that arguments not raised in a party's opening brief, as well as arguments adverted to in only a perfunctory manner, are waived").

The RFC determination sets out an individual's work-related abilities despite his or her limitations. *See* 20 C.F.R. § 416.945(a)(1). A claimant's RFC is not a medical opinion, but an administrative determination reserved to the Commissioner. *See* 20 C.F.R. § 416.927(d)(2). An ALJ "will not give any special significance to the source of an opinion on issues reserved to the Commissioner." *See* 20 C.F.R. § 416.927(d)(3). As such, the ALJ bears the responsibility for assessing a claimant's RFC based on all the relevant evidence (20 C.F.R. § 416.946(c)) and must consider all the claimant's medically determinable impairments, both individually and in combination. *See* SSR 96–8p, 1996 WL 374184 (SSA July 2, 1996).

"In rendering his RFC decision, the ALJ must give some indication of the evidence upon which he is relying, and he may not ignore evidence that does not support his decision, especially when that evidence, if accepted, would change his analysis." *Fleischer*, 774 F. Supp. 2d at 880 (citing *Bryan v. Comm'r of Soc. Sec.*, 383 F. App'x 140, 148 (3d Cir. 2010) ("The ALJ has an obligation to 'consider all evidence before him' when he 'mak[es] a residual functional capacity determination,' and must also 'mention or refute [...] contradictory, objective medical evidence' presented to him.")). *See also* SSR 96-8p, 1996 WL 374184, at *7 (SSA July 2, 1996) ("The RFC assessment must always consider and address medical source opinions. If the RFC assessment conflicts with an opinion from a medical source, the adjudicator must explain why the opinion was not adopted."). While the RFC is for the ALJ to determine, the claimant bears the burden of establishing the impairments that determine her RFC. *See Her v. Comm'r of Soc. Sec.*, 203 F.3d 388, 391 (6th Cir. 1999).

It is well-established there is no requirement that the ALJ discuss each piece of evidence or limitation considered. *See, e.g., Conner v. Comm'r*, 658 F. App'x 248, 254 (6th Cir. 2016) (citing *Thacker v. Comm'r*, 99 F. App'x 661, 665 (6th Cir. May 21, 2004) (finding an ALJ need not discuss every piece of evidence in the record); *Arthur v. Colvin*, No. 3:16CV765, 2017 WL 784563, at *14 (N.D. Ohio Feb. 28, 2017) (*accord*). However, courts have not hesitated to remand where an ALJ selectively includes only those portions of the

24

medical evidence that places a claimant in a capable light and fails to acknowledge evidence that potentially supports a finding of disability. *See e.g., Gentry v. Comm'r of Soc. Sec.*, 741 F.3d 708, 724 (6th Cir. 2014) (reversing where the ALJ "cherry-picked select portions of the record" rather than doing a proper analysis); *Germany–Johnson v. Comm'r of Soc. Sec.*, 313 F. App'x 771, 777 (6th Cir. 2008) (finding error where the ALJ was "selective in parsing the various medical reports"). *See also Ackles v. Colvin*, No. 3:14cv00249, 2015 WL 1757474, at *6 (S.D. Ohio April 17, 2015) ("The ALJ did not mention this objective evidence and erred by selectively including only the portions of the medical evidence that placed Plaintiff in a capable light."); *Smith v. Comm'r of Soc. Sec.*, No. 1:11-CV-2313, 2013 WL 943874, at *6 (N.D. Ohio March 11, 2013) ("It is generally recognized that an ALJ 'may not cherry-pick facts to support a finding of non-disability while ignoring evidence that points to a disability finding.'"); *Johnson v. Comm'r of Soc. Sec.*, No. 2:16-cv-172, 2016 WL 7208783, at *4 (S.D. Ohio Dec. 13, 2016) ("This Court has not hesitated to remand cases where the ALJ engaged in a very selective review of the record and significantly mischaracterized the treatment notes.").

SSR 19-2p states that obesity is not a listed impairment. SSR 19-2p, 2019 WL 2374244, at *4. It "provides guidance on how [SSA] establish[es] that a person has a medically determinable impairment of obesity," and how the SSA "evaluate[s] obesity in disability claims." SSR 19-2p, 94 Fed. Reg. 22924, 22924 (May 20, 2019). SSR 19-2p states, in part, "[t]he combined effects of obesity with other impairment(s) may be greater than the effects of each of the impairments considered separately," and that the RFC should account for "the effect obesity has upon the person's ability to perform routine movement and necessary physical activity within the work environment." *Id.* at 22925; *see also Miller v. Comm'r of Soc. Sec.*, 811 F.3d 825, 835 (6th Cir. 2016) (noting that SSR 02-1p, the predecessor to SSR 19-2p, "directs an ALJ to consider the claimant's obesity, in combination with other impairments, at all stages of the sequential evaluation") (citations omitted).

In the RFC analysis, the ALJ discussed SSR 19-2p and found as follows:

> Concerning the claimant's obesity, the National Institute of Health (NIH) established medical criteria for the diagnosis of obesity in its *Clinical Guidelines on the Identification, Evaluation, and Treatment of Overweight and Obesity in Adults* (NIH Publication No. 98-4083, September1998). These guidelines classify overweight and obesity in adults according to Body Mass Index (BMI), which is the ratio of an individual's weight in kilograms to the square of height in meters. However, pursuant to 19-2p, when evaluating obesity, we consider any functional limitations in the person's ability to do basic work activities resulting from obesity and from any other physical or mental impairment. If the person's obesity, alone or in combination with other impairment(s), significantly limits his or her physical or mental ability to do basic work activities, we find that the impairment(s) is severe. We find, however, that the impairment(s) is "not severe" if it does not significantly limit a person's physical or mental ability to do basic work activities. No specific weight or BMI establishes obesity as a "severe" or "not severe" impairment. Similarly, a medical source's descriptive terms for levels of obesity, such as "severe," "extreme," or "morbid," does not establish whether obesity is a severe impairment for disability program purposes. We do an individualized assessment of the effect of obesity on a person's functioning when deciding whether the impairment is severe. (See Exhibits 1F, 2F for BMI around 79; more recent records have noted a drop in BMI to around 72 i.e., 9F, 10F). In this case, the claimant's obesity has found to significantly limit the claimant's ability to do basic work activities, and therefore, is severe.

> \* \* \*

> Degeneration in her knees was noted and she BMI was consistently above 70. These findings support the above findings. A light level exertion is supported by the record that did not show upper extremity deficits. Based on the claimant's noted antalgic gait and obesity, limiting the claimant to standing/walking 2 hours is supported. More limited RFC is not supported by the record. the record does not indicate that the claimant needs an assistive device to ambulate. The record does not contain a notation that an ambulatory device is required. Exams noted the claimant either had a normal gait, or an antalgic gait. However, the claimant did not show a need for an ambulatory device at any examination. A more limited physical RFC is not supported.

(Tr. 25-27.)

The Court finds the ALJ properly considered James's obesity in formulating the RFC. The ALJ determined James's obesity constituted a "severe" impairment and "significantly" restricted her ability to

perform basic work activities. (*Id*.) The ALJ supported this conclusion by discussing notations of knee degeneration and consistently high body mass index. (*Id*.) He also cited to treatment records documenting James's weight. (*Id*. at 24-27). In finding the state agency reviewing physicians' opinions persuasive,[6] the ALJ noted postural limitations were imposed to accommodate James's obesity, knee degeneration, and shortness of breath. (*Id*. at 26.)

The Commissioner's findings are not subject to reversal merely because there is substantial evidence in the record to support a different conclusion. *Buxton v. Halter*, 246 F.3d 762, 772 (6th Cir. 2001). Deference is given to an ALJ's findings if they are supported by substantial evidence, even if substantial evidence also supports the opposite conclusion. *Lindsley v. Comm'r of Soc. Sec.,* 560 F.3d 601, 604-05 (6th Cir. 2009); *see also O'Brien v. Comm'r of Soc. Sec.*, 819 F. App'x 409, 416 (6th Cir. Aug 7, 2020) (*quoting Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 477 (6th Cir. 2003)) ("the Commissioner's decision still cannot be overturned so long as substantial evidence also supports the conclusion reached by the ALJ.")

There is no error.

### D.    Steps Four and Five

In her final assignment of error, James contends that the ALJ's determination at Steps Four and Five of the Sequential Evaluation lacked the support of substantial evidence. (Doc. No. 7 at 17.) James argues that while the ALJ found she could perform work at the light exertional level with additional limitations, the ALJ later noted her gait supported a sedentary exertional level. (*Id*. at 18.) This distinction, according to James, is critical because her past relevant work was performed at the light exertional level; thus, if limited to sedentary exertion, she would be unable to perform this work. (*Id*. at 18-19.) Moreover, she argues the

---

[6] As discussed *supra*, James fails to challenge the weight assigned to the state agency reviewing physicians on judicial review.

medical evidence shows she needs a cane for walking, and the ALJ's failure to include a cane in the RFC is cause for remand.[7] (*Id.* at 19.)

In response, the Commissioner argues that this argument "largely appears to be a rehash of some of her earlier arguments, with Plaintiff essentially arguing the ALJ should have adopted a more restrictive RFC." (Doc. No. 9 at 16.)

The Court agrees that, despite titling the argument as a challenge to Steps Four and Five, the arguments raised as part of this assignment of error consist of challenges to the RFC that are duplicative of James's earlier arguments. For the reasons set forth earlier in this decision, the Court recommends the ALJ's RFC findings be AFFIRMED.

## VII.    CONCLUSION

For the foregoing reasons, the Magistrate Judge recommends that the Commissioner's final decision be AFFIRMED.

---

[7] James's counsel is an experienced Social Security practitioner who regularly practices in this Court and has previously been warned about her continued practice of lumping various challenges to different steps of the sequential disability evaluation together. *See, e.g.*, Case No. 1:21-cv-00556, Doc. No. 19, p. 34, n.7 (filed 3/2/2022); Case No. 5:20-cv-02850, Doc. No. 19, p. 34, n. 5 (filed 2/2/2022); *see also* Case No. 5:20-cv-01340, Doc. No. 21, p. 26, n. 9 (filed 8/16/2021); Case No. 1:20-cv-01186, Doc. No. 21, p. 25, n. 8 (filed 8/16/2021). The Court has warned counsel that counsel's failure to present arguments in a way that the Court can address them, and Defendant can respond to them, may result, in the future, in the Court deeming an argument to be improper and/or declining to grant a requested page extension. *See, e.g., Masterword v. Comm'r of Soc. Sec.*, Case No. 1:21-CV-02420-JRA, 2022 WL 5250217, at *15 n.3. James's argument that the ALJ failed to include a cane in the RFC is an RFC challenge, not a challenge to Steps Four and Five. The Court finds this RFC argument to be improperly raised. Therefore, the Court recommends this argument be deemed waived and stricken. *ACLU of Ky. v. McCreary Cty. Ky.*, 607 F.3d 439, 451 (6th Cir. 2010) ("[A] district court has broad discretion to manage its docket."). *See also Bowles v. City of Cleveland*, 129 F. App'x 239, 241 (6th Cir. 2005) ("[A] district court has inherent power to 'protect[ ] the due and orderly administration of justice and ... maintain [ ] the authority and dignity of the court....'") (quoting *Cooke v. United States*, 267 U.S. 517, 539 (1925)); *Anthony v. BTR Auto. Sealing Sys., Inc*., 339 F.3d 506, 516 (6th Cir. 2003) ("[T]rial courts have inherent power to control their dockets."). Furthermore, even if this argument is not found to be waived and stricken, substantial evidence supports the ALJ's determination that an assistive device was not a medical necessity. While there may be evidence supporting James's use of an assistive device, substantial evidence also supports the ALJ's RFC determination and its compliance with SSR 96-9p. An ALJ decision cannot be reversed merely because there exists some other evidence in the record that might support a different conclusion. *See McClanahan v. Comm'r of Soc. Sec.*, 474 F.3d 830, 833 (6th Cir. 2006) ("The findings of the Commissioner are not subject to reversal merely because there exists in the record substantial evidence to support a different conclusion ... This is so because there is a 'zone of choice' within which the Commissioner can act without the fear of court interference.") (citation omitted).

Date: July 25, 2024                         _s/ Jonathan Greenberg_
                                            Jonathan D. Greenberg
                                            United States Magistrate Judge

## **OBJECTIONS**

**Any objections to this Report and Recommendation must be filed with the Clerk of Courts within fourteen (14) days after being served with a copy of this document.  Failure to file objections within the specified time may forfeit the right to appeal the District Court's order.** *Berkshire v. Beauvais***, 928 F.3d 520, 530-31 (6th Cir. 2019).**